AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>**WALTER EDWARD WADE**<br><br>*Defendant(s)* | )<br>)<br>)  Case No. **1:26-mj-00180**<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 2025__ in the county of __Butler__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1512(c)(1), and (k) | Conspiracy to obstruct justice by concealing an object; |
| 18 U.S.C. § 1512(c)(1) | Concealing an object to impair it's availability for an official proceeding; |
| 18 U.S.C. § 3 | Accessory after the fact. |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Aaron Bauder, Special Agent FBI
*Printed name and title*

Attested by the applicant by reliable electronic means, specifically, FaceTime video conference, in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: __Mar 3, 2026__

_____
*Judge's signature*

City and state: __Cincinnati, Ohio__   Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Aaron Bauder, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) assigned to the Cincinnati, Ohio Field Office Division, and have been so employed since 2019. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I am currently assigned to investigate matters involving violent crimes, gangs, robberies, criminal enterprises, narcotics, and violent crimes against children. I have participated in the preparation and execution of Federal arrest and search warrants in my position as a Special Agent. I have also been involved with the analysis of pen registers, the monitoring of Title III wire intercepts, and the installation and monitoring of tracking devices for vehicles in relation to the investigations with which I have been involved. I have also utilized confidential human sources, pen registers, toll records, physical surveillances, and electronic surveillances in the process of the investigations in which I have been involved. Further, I have been the affiant on Federal search warrants, arrest warrants, Title III wire intercepts, and have written reports during these investigations.

2. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7); that is, I am empowered by law to conduct investigations of, and to make arrests for, federal offenses as enumerated in Titles 18 and 21 of the United States Code.

3. This affidavit is in support of a complaint charging Walter Edward WADE and Ricky SHEPPARD with violations of: (1) Title 18, United States Code, Section 1512(c)(1), (k) (conspiracy to obstruct justice by concealing an object); (2) Title 18, United States Code Section 1512(c)(1) (concealing an object to impair it's availability for an official proceeding); and (3) Title

1

18, United States Code, Section 3 (Accessory After the Fact).  The information set forth in this affidavit is not intended to detail each and every fact and circumstance of the investigation or all the information known to me and other law enforcement investigators. Rather, this affidavit serves only to establish probable cause for the arrest of WADE and SHEPPARD.

## **PROBABLE CAUSE**

4. Unless otherwise noted, when I assert that statements or observations were made, I received the information from law enforcement officer(s) who provided the information to me, either verbally or in a written report. The officer(s) providing me with the information may have received the information by way of personal knowledge or from another source. The following statements are thus derived from either my personal knowledge of the investigation or from the statements/reports of other investigators and law enforcement officers.

5. On August 1, 2025, the Middletown Police Department Special Operations Unit (MPD) opened a drug trafficking investigation that later came to focus on the fentanyl overdose death of a woman who will be identified in this filing as Victim-1, and her unborn child.  The true identity of Victim-1 is known to law enforcement.  The investigation revealed that on or around July 18, 2025, Victim-1 and her unborn child likely died of a fentanyl overdose while staying at 2020 Logan Avenue, Apartment A, Middletown, Ohio.  On August 3, 2025, the bodies of Victim-1 and her baby were located inside a plastic tote in a rural, wooded area of Montgomery County Ohio. Victim-1's body was found ratchet-strapped and bound tightly, wrapped in a blue tarp inside of the plastic tote. Her baby's body was wrapped separately in a towel, which was also inside of the tote.[1]

6. A toxicology analysis was conducted on Victim-1 and her baby at the Montgomery

---

[1] As indicated below, the autopsy indicated that the baby had been delivered post-mortem.

2

County Coroner's Office. A toxicology report dated September 4, 2025 revealed that Victim-1's decomposition fluid contained fentanyl metabolite (the substance created in the body when fentanyl is metabolized), fentanyl, carfentanil, Xylazine, methamphetamine and ethanol. In addition, the baby's body contained fentanyl and fentanyl metabolites.

7. An autopsy conducted at the Montgomery County Coroner's Office also indicated that the baby had an estimated gestational age of 23-31 weeks, and that it had been delivered post-mortem. The coroner concluded that the cause of death was "undetermined" – but ruled out any signs of violence. Based on a review of the coroner's report there is no other obvious indicator of what would have caused Victim-1's death, beyond the drugs contained in her system. Further, the deputy coroner has confirmed that there was no other obvious cause of death discovered during the autopsy, and that the length of time between death and autopsy makes it more complicated to determine a cause of death. As explained below – multiple individuals involved in Victim 1's death, attempts at revival, and subsequent disposition of her body, have confirmed that she did in fact overdose.

8. On August 5, 2025, the MPD and the Montgomery County Sheriff's Office (MCSO) executed two search warrants at 2020 Logan Ave. Apt A, Middletown, Ohio 45044. The warrants were in relation to drug trafficking and the death of Victim-1 and her unborn child. The search yielded multiple narcotics-related paraphernalia and substances including what appeared to be fentanyl. Individual-1 (who stayed at 2020 Logan Ave. and, as described below, is believed to have sold controlled substances to Victim-1 resulting in her death) told law enforcement that the substance was fentanyl. However, it lab-tested as medetomidine – which is a veterinary sedative commonly used to "cut" fentanyl.

9. Investigators also located items in plain view that were consistent with the items

3

used in the death and disposal of the Victim-1 and her baby. Notably, one-half of a torn blue tarp was located in the residence. An evidence layout was conducted with the half-tarp located in the residence, and the half-tarp that was wrapped around Victim-1's body when she was discovered inside the tote. The tarps were found to be a match and were subsequently photographed. One of the photos can be viewed below. The half on the left was found in the residence, while the half on the right was found with Victim-1's body. Based on my training and experience, I believe the right half is darker due to exposure to the fluids from Victim-1's body, and from exposure to the elements.



8.  Inidividual-1, a resident of 2020 Logan Ave. Apt. A, was taken into custody and interviewed. During the custodial, post-*Miranda* interview, it was discovered that Victim-1 had died at 2020 Logan Ave Apt A, Middletown, Ohio 45044.

9.  During his interview, Individual-1 explained that Victim-1 occasionally stayed at his residence with him, and that the two had engaged in a sexual relationship. Individual-1 admitted that he sold drugs from his residence, and that Victim-1 was a drug user.

10. According to Individual-1, on the day of her death, Victim-1 had gone to the bathroom to take a shower, and he believed that she had taken drugs to get high. Individual-1 left

4

the residence for a time to get the food, and upon returning to the residence, discovered Victim-1 unresponsive in the bathtub. Individual-1 told investigators "that's when I knew she was overdosed." After discovering her unresponsive, he and his friend "Rick" delivered eight or more doses of Narcan to Victim-1. The two took turns delivering chest compressions and rescue breaths to revive Victim-1. After some time, according to Individual-1, Victim-1 started looking at him and breathing shallowly. According to Individual-1, he believed she was going to be ok, so they left her alone in the bathroom and Individual-1 left the residence. When questioned about his failure to call 911, he explained that he thought she would be ok. Moreover, he told investigators that he has administered NARCAN on several occasions.

11. While Individual-1 denied selling fentanyl to Victim-1 on the day that she overdosed, the evidence suggests otherwise. Law enforcement obtained and reviewed Cash App data showing that Victim-1 had paid Individual-1 $40 on morning that she overdosed. While reviewing GPS data on Individual-1's phone for the time of that Cash App transaction, it was found that he was at his residence, the same place where Victim-1 died. During Individual-1's interview, he admitted to selling fentanyl and said his usual sale was "40 to 60 bucks." Based on a review of phone evidence, and interviews with other individuals located in Individual-1's Cash App data, I understand that Individual-1 primarily used his Cash App to receive payment from his clients for the fentanyl he was selling. During a later interview with Ricky SHEPPARD, he confirmed he had observed Individual-1 provide controlled substances to Victim-1 previously, and he knew her to get narcotics from Individual-1. SHEPPARD said that he had witnessed Victim-1 get what he believed to be fentanyl from Individual-1 the day before she died. While reviewing messages between Individual-1 and Victim-1, it was found that they had a conversation days before her death consistent with drug activity. That conversation was followed by Victim-1

5

sending Individual-1 $20 on Cash App, and texting him to let him know. In addition, subsequent investigation has shown that Individual-1 sold controlled substances to include fentanyl or substances represented as fentanyl to multiple other individuals during this time period and before. Multiple of those individuals overdosed (some lived and some died from the overdose).

12. According to Individual-1, after leaving the scene of the overdose, he traveled to his girlfriend's residence to stay for several hours. Individual-1 explained that he did not know how long it was until he returned to 2020 Logan Ave, Apt. A, but thought it might have been the next day. He refused to look in the bathroom and admitted to detectives that he was avoiding it. According to Individual-1, his friend "Rick" was with him and told Individual-1 that he "was going to take the wheel." Individual-1 advised that "Rick" got in touch with his friend "Eddie" to remove Victim-1's corpse from his home. Law enforcement later determined that "Rick" was a reference to Ricky SHEPPARD, and "Eddie" was a reference to Walter Edward Wade. Individual-1 explained that he was too emotionally distressed to assist with the disposal of the body. "Rick" and "Eddie" put a sheet over her body, but Individual-1 claimed he did not know any further details of the disposal.

13. Detectives identified "Rick" as Ricky SHEPPARD. On the night of August 5, 2025, Ricky SHEPPARD was located in the vicinity of 608 Baltimore St Middletown, Ohio 45044. SHEPPARD was taken into custody in relation to his role disposing of/hiding the body, and he was transported to the Middletown Police Department. SHEPPARD was read his *Miranda* Rights and waived them.

14. During the post-*Miranda* interview, SHEPPARD admitted to being present when Victim-1 died from an apparent overdose, and that he left without ever calling 911 after failed attempts to render aid and administer NARCAN. SHEPPARD also admitted to assisting with the

6

disposal of her corpse. SHEPPARD claimed that "Ed" or "Eddie" and Individual-1 loaded her corpse into a tote and into the back of Individual-1's vehicle. SHEPPARD then drove the tote to another location with "Eddie" where they then offloaded the tote and left.

15. The Montgomery County Sheriff's Office obtained a search warrant for SHEPPARD'S cell phone that had been in his possession when he was arrested on August 5, 2025. A search of that cell phone revealed that on July 23, 2025, SHEPPARD messaged two individuals on Facebook Marketplace attempting to purchase one or two 55-gallon drums. The messages show that SHEPPARD was looking for it to be empty and have a lid. On July 25, 2025, SHEPPARD continued the conversation with one seller and said he needed one "asap."

16. Detectives with the Middletown Police SOU received information from a Miami Township Detective that "Eddie" had potentially been dropped off at 401 Garfield St., Middletown, Ohio. It was determined that "Eddie" was Walter Edward WADE. On August 20, 2025, the MPD made contact with WADE, aka "Eddie," and others at the rear of that residence. WADE agreed to come to the Middletown Police Department to speak with detectives and was transported there.

17. WADE was read his *Miranda* Rights, which he waived, and was interviewed. During the interview WADE explained that he was contacted by SHEPPARD to work on a "clean out" with him (SHEPPARD) and Individual-1. He admitted to going to Individual-1's house and helping Individual-1 and SHEPPARD load a tote into Individual-1's vehicle. At first, WADE claimed that, while at the residence, he was told that the tote was filled with tools. WADE described the tote as black with a blue lid, which matched the description of the tote that was found to contain the bodies of Victim-1 and her baby. WADE and SHEPPARD drove to an unknown location where he helped SHEPPARD unload the tote. WADE claimed he asked again about the

7

contents of the tote, and SHEPPARD told him there was a body in it. WADE never reported or contacted police with this information. WADE advised that he did not know Individual-1 well and was afraid of him.[2]

18. On October 30, 2025, SHEPPARD agreed to do a second interview.[3] He was also read his *Miranda* Rights for this interview. During the second interview, SHEPPARD admitted that, after or while providing NARCAN to Victim-1, he took out his phone and told Individual-1 they should call 911. Individual-1 took the phone from SHEPPARD, and said he would take care of it. Individual-1 did not call 911. On a later date (4-5 days later), SHEPPARD returned to the residence, and observed that Individual-1 had the door to the bathroom (where Victim-1 was located) screwed shut. SHEPPARD also admitted that he brought WADE in after Individual-1 asked for someone to help. SHEPPARD stated that WADE was paid by Individual-1 to help remove the corpse, and that WADE knew the details before they even went to Individual-1's residence (i.e., that he was moving the body of someone who overdosed). SHEPPARD stated that WADE and Individual-1 removed Victim-1 from the bathtub and placed her in the tote. WADE used screws to shut the tote tight. After WADE screwed the tote shut, Individual-1 and WADE loaded the tote into Individual-1's Tahoe. SHEPPARD again explained that he drove the Tahoe and that WADE rode with him to another location where they unloaded the tote with her corpse

---

[2] During their interviews, WADE, SHEPPARD, and Individual-1 at various times (and to varying degrees) disclaimed responsibility for their roles (or the roles of others) in the overdose, and/or moving the body. However, based on subsequent interviews, physical evidence, a review of the electronic evidence, and my training and experience – I believe that SHEPPARD's subsequent admission is correct: that he and WADE knowingly moved the overdosed bodies on behalf of Individual-1, to cover up the overdose from law enforcement.

[3] [redacted]

8

and left. SHEPPARD was asked about the messages on his phone attempting to buy 55-gallon drums and advised that Individual-1 had requested that he look for them. SHEPPARD further admitted that Invidual-1 told him and WADE "make sure it don't get found" – in apparent reference to the body of Victim-1. In his own interviews, WADE has disputed much of the information provided by SHEPPARD, including at first denying he knew what was in the tote, but later admitting that he had pulled the body off the truck. WADE also admitted that he never came to the police department to report what he had done. At various times, WADE also claimed he was threatened, high, or drugged, during his involvement. Based on the context of the interviews, and his inconsistent responses, I do not believe these claims to be truthful.

## CONCLUSION

19. The above facts set forth probable cause to believe that WADE and SHEPPARD are in violation of: (1) Title 18, United States Code, Section 1512(c)(1), (k) (conspiracy to obstruct justice by concealing an object); (2) Title 18, United States Code Section 1512(c)(1) (concealing an object to impair it's availability for an official proceeding); and (3) Title 18, United States Code, Section 3 (Accessory After the Fact). I respectfully request that an arrest warrant be issued for WADE and SHEPPARD for these violations.

Aaron Bauder
Special Agent, FBI

Affidavit submitted to me by reliable electronic means and attested to me as true and accurate by FaceTime video conference consistent with Fed. R. Crim. P. 4.1, 4(d), and 41(d)(3), this __3__ day of March, 2026.

Hon. Stephanie K. Bowman
Chief United States Magistrate Judge

9